229 So.2d 776

**BURMA HILLS DEVELOPMENT CO., Inc., a Corp., and City of Mobile, etc.**

**v.**

**Thomas M. MARR.**

**1 Div. 404.**

Supreme Court of Alabama.

Dec. 11, 1969.

Tyson, Marr & Friedlander and Charles S. Street, Mobile, for appellee.

Fred G. Collins, Collins, Galloway & Murphy, Mobile, for City of Mobile.

Gaillard, Wilkins & Smith, Mobile, for Burma Hills Development Co., Inc.

LIVINGSTON, Chief Justice.

This is an appeal from a decree of the Circuit Court of Mobile County, Alabama, in Equity.

The original bill of complaint filed in this case asked that the trial court decree that the complainant (appellee) had a valuable property right in Lot #14 of High Point Estates Subdivision which must be condemned if said lot were used for public purposes, and praying for a temporary injunction enjoining respondents Burma Road Development Company, Inc., and City of Mobile, from constructing or building a public street on said lot pending a determination of the property rights of the parties to the bill of complaint. On the date set for hearing the application for a temporary injunction, Burma Road Development Company, Inc., filed a demurrer and answer. The demurrer was sustained and the application for a temporary injunction denied. The complainant then filed an amended bill of complaint, to which demurrers were filed by the respondents; both demurrers were overruled and respondents were given twenty days in which to file an answer. Burma Road Development Company, Inc., made a motion to amend its demurrer as theretofore filed. Before the court ruled on said motion, complainant amended his bill of complaint, changing the name of respondent Burma Road Development Company, Inc., to Burma Hills Development Corporation. The amended demurrer then filed by Burma Hills Development Corporation was over-

ruled. Each of the respondents then filed an answer. The court issued its decree on April 14, 1966, in favor of complainant. From said decree, respondents filed timely notice of appeal.

The complainant owns an undivided one-half interest in Lot #13 of High Point Estates Subdivision; said lot is adjacent to and east of Lot #14 of said subdivision. Both lots are burdened with mutual restrictive covenants providing, inter alia, that "No lot shall be used except for residential purposes." Appellant Burma Hills Development Corporation is the owner, in fee, of Lot #14. On July 15, 1964, appellant City of Mobile filed a condemnation proceeding against Burma Hills Development Corporation seeking to condemn a portion of Lot #14 for purposes of a public road. The condemnation proceeding resulted in an award of one dollar ($1.00). No part of that portion of Lot #14 condemned for the purpose of a public road touches or abuts on complainant's property, Lot #13. The complainant herein was not named as a respondent in the condemnation proceeding instituted by the City of Mobile.

After stating the facts as determined from the evidence presented, that part of the trial court's decree pertinent to our consideration of the questions presented on this appeal is as follows:

"1. There is an actual controversy existing between the Complainant and the Respondents.

"2. By virtue of the mutual restrictive covenants, the Complainant has a right, title and interest in Lot 14 of High Point Estates Subdivision, and that such right, title and interest must be obtained by condemnation proceedings before any public street may be constructed on said Lot 14 of High Point Estates Subdivision.

"3. The Complainant will suffer immediate and irreparable injury if said public street is constructed on said Lot 14 of High Point Estates Subdivision be-

fore the Complainant's right, title and interest in said Lot 14 of High Point Estates Subdivision is obtained or condemned.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Respondents' (sic) right, title and interest in Lot 14 of High Point Estates Subdivision must be obtained or condemned before any public street is constructed on said Lot 14 of High Point Estates Subdivision, and that the Respondents be and hereby are enjoined from constructing a road across Lot 14 in High Point Estates Subdivision until the Complainant's right, title and interest in said lot is obtained or condemned."

Assignments of error 1 and 2 are closely related; both question the action of the trial court in ruling that the construction of a public road across Lot #14 would violate the restrictive covenants limiting the use of the lots in High Point Estates Subdivision to "residential purposes." Appellant adopts and incorporates the argument in support of assignment of error 1 for assignment of error 2. What we say in answer to assignments of error 3, 4, 5 and 6 is basic to our disposition of assignments of error 1 and 2. Therefore, we withhold further comment on assignments of error 1 and 2 pending our disposition of assignments of error 3, 4, 5 and 6. Appellant adopts and incorporates his argument under assignment of error 3 in support of assignments of error 4, 5 and 6.

█ Assignments of error 3, 4, 5 and 6 are predicated upon the ruling of the trial court that the complainant has a right, title and interest in Lot #14 of High Point Estates Subdivision which must be obtained by condemnation proceedings before any public street may be constructed on said lot. We are thus confronted with the following question:

"Does a restrictive covenant or the right to enforce a restrictive covenant constitute a property right, the taking of which necessitates condemnation and the payment of compensation or damages to those persons entitled to enforce the restrictive covenant where the restricted land is taken or used for public purposes?"

█ The courts of this state hold that restrictive covenants create equitable easements in favor of the several lots subject to such covenant which may be enforced by any one of the lot owners. Stringer Realty Co. v. City of Gadsden, 256 Ala. 77, 53 So. 2d 617; Scheuer v. Britt, 218 Ala. 270, 118 So. 658. However, Alabama courts have never expressly held that restrictive covenants create property rights which must be condemned upon a taking or acquisition of the servient estate. The question is one of first impression in this state and is far from settled in other jurisdictions.

The problems encountered where a tract of land is subdivided into lots, each of which is burdened with a mutual restrictive covenant, are treated in detail in 2 Nichols on Eminent Domain, Section 5.73. Also see 4 A.L.R.3d 1137. We quote rather extensively from 2 Nichols on Eminent Domain, supra:

"§ 5.73. Restrictive covenants.

"A rather perplexing situation arises out of the existence of what are commonly called 'building restrictions.' A large tract of land is often cut up into lots and sold for residential purposes, and each lot is sold subject to restrictions against use for various purposes, the restriction upon each lot being for the benefit of all the others. So far as such restrictions are reasonable in their character, they are enforced by courts of equity in favor of the original owner, so long as he continues to own any part of the tract for the benefit of which the restrictions were created, as well as in favor of the owner of any one of the lots into which the tract was divided, and against the owner of any of the lots who attempts to disregard the restrictions. Such restrictions do not, how-

ever, have an inhibiting influence upon the right to exercise the power of eminent domain.

"A conflict of opinion has arisen in the disposition of the question whether a person in whose favor such a restriction exists has a compensable interest in a condemnation proceeding which prevents compliance with such restriction."

Nichols then sets out the positions taken on the above-stated question, to wit:

"[1]  Majority view.

"The majority view holds that such a restriction, often characterized as an equitable servitude, constitutes property in the constitutional sense and must be compensated for if taken. Such restrictions constitute equitable easements in the land restricted, and when such land is taken for a public use that will violate the restrictions, there is a taking of the property of the owners of the land for the benefit of which the restrictions were imposed. The owners of such property cannot maintain proceedings for damages against the original owner or enforce the restrictions against the condemnor, but they are entitled to an award of compensation for the destruction of their easements.

"[2]  Minority view.

"On the other hand, objection has been raised to paying more than such value for all the interests in the property taken and by reason thereof negative easements belonging to other owners have been taken without payment of compensation.

"It has been argued that such restrictions were not intended to apply as against public improvements;—that, since all property is held subject to the power of eminent domain, the rights of the condemnor are impliedly excepted from the operation of the restrictive covenant.

"It has further been held that such restrictions could not possibly inhibit the action of the sovereign because any such attempt would be void as against public policy since they constitute an attempt to prohibit the exercise of the sovereign power of eminent domain. Since the state has the power to condemn the fee prior to the imposition of a restrictive covenant, the placing of the additional burden upon the land does not create a new compensable interest

"Denial of compensation has also been justified upon the ground that such restrictions do not constitute property at all, but are merely contract rights which need not be compensated for in eminent domain. Such contract rights, it has been reasoned, are enforceable as against individuals but not as against the state. It has been held to be neither the taking of a vested interest nor a breach of the covenant.

"The final argument in support of a denial of compensation in a specific case is predicated upon a construction of the particular restrictive covenant in such manner that the prospective use does not constitute a violation thereof."

We have considered carefully those cases cited in support of the "Majority view" and the "Minority view," as categorized in *Nichols*, supra. We are of the opinion that the better-reasoned cases are those based upon one or more of the arguments set forth in *Nichols*, supra, in support of the "Minority view." We note that the Supreme Court of Florida in Board of Public Instruction of Dade County v. Town of Bay Harbor Islands, 81 So.2d 637, disagreed with the textual statement in *Nichols*, supra, as to that which constituted the "Majority view"; that is, that such a restriction as is here under consideration constitutes property in the constitutional sense for which compensation must be paid if taken.

In Friesen v. City of Glendale, 209 Cal. 524, 288 P. 1080 (1930), all of the deeds conveying the lots in question contained a provision that " * * * said premises

shall be used for residence purposes only." The plaintiffs were attempting to enjoin the City of Glendale from constructing a public street across a portion of another lot in the subdivision, contending that such a use did not constitute a "residential purpose," within the meaning of the language of the covenant. Denying the injunction, the California court stated:

"What then is the nature of the title of the city or of the plaintiffs and other lot owners in the tract, which would prevent the city from improving the portion of Lot 2 for street purposes as now proposed? The building restriction under consideration is in the nature of a negative easement or equitable servitude * * *. It is not a positive easement or right in the land itself which would permit of the physical use or occupation thereof by the other lot owners in the tract. It is merely a right enforceable in equity as between the parties to the contract, or their successors with notice, on the theory that it would be unconscionable to permit one who has contracted to use his property in a particular way to violate his agreement. It is a familiar rule that, when the physical conditions in the vicinity of the land thus restricted have so changed as to render it unconscionable to enforce the restriction, equity will refuse to enforce, and the restriction as to its enforceability then fades out of the contract of the parties. It is also well established that the 'provisions of an instrument creating or claimed to create such a servitude will be strictly construed, any doubt being resolved in favor of the free use of the land.' * * * This rule would seem to be especially applicable where the title to the land is acquired by a municipality for public street purposes. To construe the instrument strictly in favor of the servitude would impose upon the city the obligation to use the land acquired for residential purposes only, a use to which the city obviously has no power to devote land acquired for street purposes.

A construction strictly against the covenant would permit the city to acquire the land freed from the restriction. * * *."

The Court of Appeals of Louisiana, in Gremillion v. Rapides Parish School Board, 134 So.2d 700 (La.App.1961), focused its attention primarily on the public policy considerations involved in construing restrictive covenants and the exercise of the power of eminent domain. The suit was for the specific performance of an agreement to buy certain realty. The school board contended that the plaintiff did not have a merchantable title because of restrictions in the deed to the plaintiffs. The substantial question considered by the court was whether the owner of land in whose favor there is a covenant restricting adjoining land to residential purposes has a property right such as requires compensation when such adjoining land is taken by an educational agency of the state for educational purposes. The court held that restrictive covenants affecting property which is acquired for governmental purposes do not, as against a governmental agency, constitute a property right of owners of land which is not taken in favor of which the covenants run. The court observed:

"Some of these decisions also note that in many instances, such as for example in cases of the large modern subdivisions containing many hundreds or even thousands of lot owners, an insuperable burden to exercise of the governmental power of eminent domain would be created by any requirement that all other lot owners be impleaded or compensated before any public improvement be undertaken upon any individual lot of the entire tract subject to restrictive covenants. Such covenants could so be used deliberately to defeat the acquisition of property for governmental purposes; * * *."

The Supreme Court of West Virginia applied similar reasoning in State ex rel. Wells v. Dunbar, 142 W.Va. 332, 95 S.E.2d

457 (1956), holding that covenants of this nature should not be construed so as to require the government, in the taking or acquiring of private property for governmental use, to respond in damages either on the theory of the taking of a vested right, or for breach of the restrictive covenant. That court stated:

" * * * To hold otherwise would enable those having title to real estate often to greatly inconvenience and, perhaps, defeat the proper and orderly exercise by the government of the right of eminent domain, guaranteed to it by the Constitution, and absolutely necessary for the operation of the government in a manner best for the interests of all its citizens. No few citizens should be permitted to so contract as to destroy, or make prohibitive to the government, the right to acquire property for necessary governmental purposes. As pointed out in the cited cases, those who enter into such covenants do so with the knowledge that the government has the absolute right to acquire lands for governmental purposes, and they cannot be presumed to have intended an interference with such right." Id., at 461.

In Anderson v. Lynch, 188 Ga. 154, 3 S.E.2d 85, 122 A.L.R. 1456 (1939), the Supreme Court of Georgia directed its attention to the practical problems potentially involved and resulting from a holding that a restrictive covenant creates in each and every party thereto a property interest such that the parties thereto must be impleaded in a condemnation proceeding prior to the use of the land for public purposes. That court quoted from City of Houston v. Wynne, Tex.Civ.App., 279 S.W. 916, 919, as follows:

" * * * 'Appellees' contention, if carried to its extreme, is that, if there was an addition to the city in which there were 10,000 lots, the city would be required to serve the owner or owners of each lot in a suit to condemn any one of such lots for public purposes. Such

contention, if established as the law governing such matters, would be practically to prohibit the city from condemning property so situated for public use; it would at least greatly restrict the rights of the city to condemn property for public purposes. It is apparent that, if it could not do so in cases where the owners of the lots are 10,000 or more in number, it could not do so when there are 1,000 or 1,500 in number.'" Id., at 88.

That which was said by the Supreme Court of Georgia in Anderson v. Lynch, supra, was cited with approval in Board of Public Instruction of Dade County v. Town of Bay Harbor Islands, 81 So.2d 637, a Florida case involving a condemnation of property for a school building in a subdivision wherein the lots were burdened with a restrictive covenant limiting the use of said property to residential purposes. In its opinion, the court cited numerous authorities in support of each of the views set forth in *Nichols*, supra. We quote at length from that opinion:

" * * * The recent trend, and we think the better view, if it is not actually the majority view, is that so ably presented and adopted by the Georgia Supreme Court in 1939 in the case of Anderson v. Lynch, 188 Ga. 154, 3 S.E.2d 85, 122 A.L.R. 1456, a case of first impression in that court. There it was concluded, after a review of the cases on the subject, and in full recognition of the substantial authority to the contrary, that restrictions of the kind we are concerned with here, and which were being dealt with in that case, convey no interest in the land, are not true easements, and at best may be relied upon and enforced between the parties thereto and their successors with notice. That Court concluded, and we think correctly, that such restrictions do not vest in the owners of other lands in the subdivision a property right for which compensation must be made in the event said lands are taken for and devoted to a public use

even though such use is inconsistent with the use to which said lands are restricted by private agreement.

\* \* \* \* \* \*

"We think the conclusion reached by us is not only supported by what we believe to be the best considered cases but also by logic and reason. Were we to recognize a right of compensation in such instances, it would place upon the public an intolerable burden wholly out of proportion to any conceivable benefits to those who might be entitled to compensation. In the event of the construction of a public building in a large subdivision containing many separate ownerships, a determination of the varying degrees of damage, if any, which might be claimed by the individual lot owners would present obstacles of an unwarranted nature in the exercise of the sovereign power. It would afford little, if any, actual benefit to the landowner.

"Moreover, were we to adopt the rule contended for by appellee and hold that restrictions of the nature which we have been discussing constitute property for which compensation must be made, it would be necessary in all instances where streets or highways were extended or enlarged through subdivisions having restrictions of such nature that the consent of every property owner in such subdivision be obtained or his interest acquired by eminent domain before such improvement could lawfully be made. It would be just as much a violation of a restriction limiting the use of specific property to residential purposes to construct a road or a sidewalk over it as a school or fire house or town hall. While these considerations are not controlling, where there is respectable authority both ways, they would be compelling and forceful factors in the determination of which way the scales of reason and justice incline. *In such cases the courts should consider practical matters and problems as well as theories.* (Emphasis supplied.) Id., at 643, 644.

That which we have quoted from the above-cited authorities is representative of the position of those jurisdictions which follow what *Nichols*, supra, labels the "Minority view." These authorities are persuasive to our conclusion that the question presented herein for decision should be answered in the negative. We hold that a restrictive covenant or the right to enforce a restrictive covenant *does not* constitute such a property right, title and interest as requires the payment of compensation or damages to those persons entitled to enforce the restrictions of said covenants where the restricted land is taken for and devoted to public purposes. Assignments of error 3, 4, 5 and 6, each of which is predicated upon complainant having a right, title and interest in Lot #14 by virtue of the mutual restrictive covenants, are therefore meritorious.

Assignments of error 1 and 2 are to the effect that the trial court erred in ruling that the construction of a public street on Lot #14 of High Point Estates Subdivision would be a violation of the mutual restrictive covenants limiting the use of said property to residential purposes. The question presented by these assignments of error is rendered moot by our holding as to assignments of error 3, 4, 5 and 6. That is, regardless of whether the construction of a public street across Lot #14 would be a violation of the mutual restrictive covenants, complainant has no right, title and interest in said lot such as requires the payment of compensation or damages when a public street is constructed on said lot.

The decree of the lower court is due to be, and is, reversed and rendered

Reversed and rendered.

LAWSON, MERRILL, HARWOOD and MADDOX, JJ., concur.